J-S58011-14

**NON-PRECEDENTIAL DECISION - SEE SUPERIOR COURT I.O.P. 65.37**

| COMMONWEALTH OF PENNSYLVANIA, | IN THE SUPERIOR COURT OF PENNSYLVANIA |
|---|---|
| Appellee | |
| v. | |
| DANNY KEITH KIRTLEY, | |
| Appellant | No. 1680 WDA 2013 |

Appeal from the Judgment of Sentence November 28, 2012
in the Court of Common Pleas of Washington County
Criminal Division at No.: CP-63-CR-0000462-2011

BEFORE: GANTMAN, P.J., BENDER, P.J.E., and PLATT, J.[*]

MEMORANDUM BY PLATT, J.:                    **FILED NOVEMBER 7, 2014**

Appellant, Danny Keith Kirtley, appeals from the judgment of sentence imposed following a jury conviction of voluntary manslaughter and two counts of aggravated assault. Appellant challenges the denial of various motions to suppress, other evidentiary issues, the denial of a mistrial, and the length of his sentence. We affirm on the basis of the trial court opinion.[1]

_____

[*] Retired Senior Judge assigned to the Superior Court.

[1] We note that the judge who presided at the jury trial, the Honorable Janet Moschetta Bell, retired January 4, 2013. On February 1, 2013, the case was re-assigned to the Honorable John F. DiSalle, who authored the trial court opinion. (**See** Trial Court Opinion, 5/07/13, at 15).

In its opinion, the trial court fully and correctly sets forth the relevant facts and procedural history of this case. (**See** Trial Court Opinion, 5/07/23, at 3-15). Therefore, we have no reason to restate them in detail here.

We note briefly for convenience and context that Appellant shot the victim, Trevor Compton, a co-worker, after the victim and another co-worker, Roy Moll, physically attacked him in an ongoing workplace dispute at the welding shop where they all worked. While recollections of details differed, Appellant had severely criticized his fellow workers, including a telephone conversation in which he called them "lazy and worthless." It may have been overheard by the co-workers he criticized. Also, apparently unknown to Appellant at the time, but possibly known by his co-workers, the owner of the welding shop, David ("Matt") Rosenbloom, had informed his shop supervisor, Chris Goss, that he planned to fire Appellant.

In any event, when Appellant returned to the welding shop on February 10, 2011 from an outside assignment, Compton and Moll got into a verbal altercation with him. Appellant threw a punch which missed, turning the argument into a fistfight.[2] They beat Appellant up. He suffered injuries to the ear, face, and head, knocking him to the ground. Then Appellant

_____

[2] Appellant also later claimed that he was beaten with a pipe.

stood up, took a handgun out of his pocket and fired one shot at Compton, fatally wounding him.[3]  The workers called 911.

Transported to a hospital, Appellant made various statements to law enforcement *en route*.  At the hospital he signed an acknowledgement of his *Miranda* rights and a waiver of them, and spoke to Detective John Wybranowski, Jr.[4, 5]

The trial court consolidated and denied five motions to suppress Appellant's various statements.  At trial, Appellant testified, claiming self-defense.  He maintained he was in fear for his own life.  His statements were admitted into evidence.  When the prosecutor cross-examined him on the discrepancies between his prior statements and his trial testimony, Appellant's defense attorney asked for a mistrial, asserting that the cross-examination violated his constitutional right against self-incrimination.  The jury convicted Appellant of voluntary manslaughter, (and the aggravated assaults), but acquitted him of murder of the third degree.

_____

[3] The night before, during a search for a prowler, Appellant had produced his handgun and shown it to his coworkers.

[4] *See Miranda v. Arizona*, 384 U.S. 436 (1966).

[5] Police also overheard telephone conversations in which Appellant told both his wife and his girlfriend that he had to shoot the victim to protect himself. He spoke similarly to a corrections officer at county prison who asked him what happened to his head.  Appellant previously assigned error to the admission of these statements, but he has abandoned those claims in this appeal.

At sentencing, the court noted, *inter alia*, its review of the presentence investigation report (PSI). (*See* N.T. Sentencing, 11/28/12, at 23-26). It observed that Appellant knowingly brought a loaded pistol into the workplace. Furthermore, Appellant, who continued to claim self-defense, did not show any remorse, indicating to the sentencing court a low likelihood of rehabilitation. It acknowledged the permanent impact the victim's death would have on his children and the rest of his family. The court sentenced Appellant to a term of not less than seven nor more than twenty years' incarceration, a sentence in the aggravated range. This appeal followed.

Appellant raises eight questions for our review:[6]

> 1. Whether the Court failed to give adequate consideration to all relevant factors, including [Appellant's] criminal, family and work history when crafting a sentence in this matter[?]
>
> 2. Whether it was an error to deny the motion to suppress statements that [Appellant] made to Detective Wybranowski during an interview on February 10, 2011[?]
>
> 3. Whether it was an error to deny the motion to suppress statements that [Appellant] made to Detective Wybranowski while being transported to jail on February 10, 2011[?]
>
> 4. Whether it was an error to deny the motion to suppress statements that [Appellant] made at the crime scene on February 10, 2011[?]
>
> 5. Whether it was an error to deny [Appellant's] objection to two 911 audiotapes, containing hearsay, which were admitted

---

[6] We note that after he filed a notice of appeal, Appellant's trial counsel was permitted to withdraw. The court then appointed the Public Defender to represent Appellant.

under the *res gestae* exception[?] (Trial Transcript (hereinafter TT) p. 4 — 5). [sic]

      6. Whether it was an error to deny [Appellant's] objection to the introduction of testimony that [Appellant] possessed a weapon and displayed the weapon the night before the incident, as it was irrelevant and highly prejudicial[?] (TT p. 66-67, 140-141). [sic]

      7. Whether it was an error to deny [Appellant's] objection to the introduction of evidence regarding a conversation between D. Rosenboom and Chris Goss regarding whether to fire [Appellant], which was never communicated to [Appellant] and was inadmissible hearsay[?] (TT p. 204-210). [sic]

      8. Whether it was an error to deny [Appellant's] motion for a mistrial based on the improper questioning of [Appellant] regarding his decision to remain silent on the day of the incident[?] (TT p. 775). [sic]

(Appellant's Brief, at 7).

After a thorough review of the record, the briefs of the parties, the applicable law, and the comprehensive, well-reasoned opinion of the trial court, we conclude that there is no merit to the issues Appellant has raised on appeal. The trial court opinion properly disposes of the questions presented. (*See* Trial Ct. Op., at 16-30) (finding: (1) sentence was reasonable and proper under the circumstances where court had reviewed PSI and gave the following reasons for the sentence: Appellant's lack of genuine remorse, his continued self-justification, and minimization of harm and anguish caused, blame of others, and low likelihood of rehabilitation; (2) court properly denied suppression of the statements to Detective Wybranowski given after Appellant signed notice and waiver of **Miranda**

- 5 -

rights, where, in totality of circumstances, Appellant, although treated eight hours earlier for head injuries, was in no apparent discomfort and did not appear to be fatigued or confused; (3) court properly denied suppression of the statements to Detective Wybranowski while being transported where statements were spontaneous utterances and not responses to interrogation; (4) court properly denied suppression of statements made to responding officers at crime scene under public safety exception; (5) 911 tapes were admissible under the *res gestae* exception; (6) evidence of Appellant's display of his handgun the night before the shooting to co-worker was highly relevant and did not unduly prejudice Appellant; (7) conversation between Rosenboom and Goss on firing Appellant was admissible to show course of conduct and motive; and (8) motion for mistrial was properly denied where cross-examination of Appellant addressed inconsistencies between his trial testimony and his prior statements, not his Fifth Amendment right to remain silent). Accordingly, we affirm on the basis of the trial court's opinion.

Judgment of sentence affirmed.

Judgment Entered.

Joseph D. Seletyn, Esq.
Prothonotary


Date: <u>11/7/2014</u>



S58011-14

IN THE COURT OF COMMON PLEAS OF WASHINGTON COUNTY, PENNSYLVANIA
CRIMINAL DIVISION

COMMONWEALTH OF PENNSYLVANIA,       )
                                    )
        v.                          )       CP-63-CR-0000462-2011
                                    )       1976 WDA 2012
DANNY KEITH KIRTLEY,                )
                                    )
                Defendant.          )

APPEARANCES:

Michael J. Lucas, Esquire
First Assistant District Attorney
Representing the Commonwealth

David S. Shrager, Esquire
Representing Defendant at Trial
and on Appeal

Danny Keith Kirtley
SCI Camp Hill
Inmate # KV5149

John F. DiSalle, J.
May 7, 2013

## OPINION

This is the Court's Pa.R.A.P. 1925(a) Opinion on defendant's appeal from a jury's

verdict of guilty on September 18, 2012 and the Trial Judge's corresponding *Order of*

*Sentence* dated November 28, 2012, upon defendant's convictions of voluntary

manslaughter and aggravated assault. This case having been heard by retired Judge Janet

Moschetta Bell, and a *Concise Statement of Matters Complained of on Appeal* having

been filed on February 21, 2013, subsequent to the retirement of Judge Moschetta Bell,

this Court authors the following Pa.R.A.P. 1925(a) Opinion to address the legal issues

raised on appeal. This Court is not in a position to review the fact and credibility



determinations of the fact-finder, in this case the jury. *See Armbruster v. Horowitz*, 813 A.2d 698 (Pa. 2002); *Commonwealth v. Yogel*, 453 A.2d 15, 16 (Pa. Super. 1982) (holding that "[w]here the issue involved is one purely of law, the fact that someone other than the hearing judge wrote the opinion would be of little significance"). Here, all of the issues raised on appeal are purely of law; i.e. the weight and sufficiency of the evidence supporting the jury's verdict of guilty and the corresponding sentence imposed by the Trial Judge have not been challenged. (Docket 65).

Defendant was found guilty, after a jury trial, of Voluntary Manslaughter – Unreasonable Belief, a felony of the first degree, 18 Pa.C.S.A. § 2503(b); Aggravated Assault – Serious Bodily Injury, a felony of the first degree, 18 Pa.C.S.A. § 2702(a)(1); and Aggravated Assault – Bodily Injury with a Deadly Weapon, a felony of the second degree, 18 Pa.C.S.A. § 2702(a)(4). Defendant was found not guilty of Criminal Homicide – Murder of the 3rd Degree, 18 Pa.C.S.A. § 2501, 2502(c). The charge of Simple Assault, 18 Pa.C.S.A. § 2701(a)(2), a misdemeanor of the second degree, was *nolle prossed* by the Commonwealth. (Docket 51, 53). Defendant was sentenced to a term of confinement of seven to twenty (7-20) years in an appropriate state penal institution on the charge of Voluntary Manslaughter – Unreasonable Belief. (Docket 53). The defendant received no further penalty on the two charges of Aggravated Assault due to the doctrine of merger. (Docket 53). Judge Moschetta Bell heard pre-trial motions and presided at trial and sentencing, but has since retired, effective January 4, 2013.

In his *Concise Statement of Matters Complained of on Appeal*, pursuant to Pa.R.A.P. 1925(b), the defendant makes categorical claims that the Trial Judge erred/abused her discretion when she: (1) denied his suppression motions; (2) admitted

certain Commonwealth evidence and testimony over counsel's objections; (3) denied his motion for a mistrial based on an alleged improper comment by the prosecutor as to his right to remain silent; and, (4) sentenced him to an unduly harsh and improper sentence under the circumstances. (Docket 65).

## Factual Background

This case stems from the victim, Trevor Compton, being shot and killed by the defendant, Danny Keith Kirtley, in North Strabane Township, Washington County on the afternoon of February 10, 2011. David "Matt" Rosenboom, owner of Rosenboom Welding and Angel Logistics and primary supervisor of the victim and defendant at the time of the incident, testified that his employee roster in February of 2011 consisted of the victim, the defendant, Chris Goss, Roy Moll, and Richard Smith. All of Mr. Rosenboom's "employees" were treated as independent contractors. (Trial Transcript [T.T.] 199-203, 216).

Roy Moll, a co-worker of the victim and defendant in February of 2011, testified that the victim was often called "Pork Chop" or "Casey." Mr. Moll explained that on the night before the incident, he was in the shop working, along with the defendant and Ryan Smith, when he heard a loud noise outside. He went outside with the defendant who proceeded to go to his truck and return with a handgun saying, "That's why I carry this." (T.T. 143). The source of the loud noise was never found, but Mr. Moll did hear the victim and the defendant arguing in the shop that night about the amount of work the defendant had left to finish. Mr. Moll testified that he had helped the defendant finish his work that night before leaving. (T.T. 133-45).

3

Matt Rosenboom testified that the defendant called him the night before the incident and told him that the other workers were "lazy and worthless" and would not help him finish his work. (T.T. 216). After the call with the defendant concluded, Mr. Rosenboom called supervisor Chris Goss to send the defendant to a job near the West Virginia border the next day in order to keep the employees separated in an effort to quell the tension. The next day, the day of the incident in question, the decision was made by Mr. Rosenboom to fire the defendant after receiving a complaint from the customer at the site where the defendant was working. Mr. Rosenboom called Chris Goss and told him that the defendant was to be fired when he turned his time sheet in that day, and that he would be willing to fire the defendant over the phone if Mr. Goss did not want to do it in person. (T.T. 203-16).

Chris Goss, supervisor to the victim and the defendant at the time of the shooting, testified that on February 10, 2011, he sent the defendant to work at a gas rig near the West Virginia border after speaking with Mr. Rosenboom over the phone. He told the defendant to make sure to collect his field tickets and turn in his timesheet that day, Thursday, as the workers were paid on Friday and Mr. Goss had to fly home to Mississippi the next day. (T.T. 217-32).

At approximately 4:00 p.m. on Thursday, Mr. Moll went outside to try to start his diesel pickup truck which had been giving him trouble due to the cold weather. While in the parking lot, he observed the defendant sitting in his truck. Mr. Moll came back into the shop and struck up a conversation with the victim when he saw the defendant come in the shop and walk towards Chris Goss. Mr. Moll proceeded to ask the defendant about the "shit he was talking," to which the defendant responded by walking within arms-

4

reach of him and saying, "that's right, I said it and I'll say it again." (T.T. 153). At this time, the defendant took a swing at Mr. Moll, but the punch did not connect. Mr. Moll responded with a punch of his own, which did connect with the defendant's head, sending him to the ground. The defendant proceeded to grab Mr. Moll's right leg and would not let go so Mr. Moll started "beating him on his head and trying to get him off." (T.T. 154). Mr. Moll hit the defendant with both hands for approximately twenty (20) seconds at which time the defendant let go. Mr. Moll testified that he was the only person hitting the defendant. (T.T. 150-55).

Mr. Goss testified that he was inside the shop welding a set of metal stairs that afternoon when he heard a vehicle pull up outside. He continued welding until he heard a commotion inside the shop, and upon finishing his weld and raising his welding shield, he saw the defendant and Roy Moll fighting. He walked towards the two men while yelling at them to stop. He witnessed the defendant on his knees slipping in some water on the floor, while at the same time observing Roy Moll run out the door. (T.T. 232-42).

The defendant, upon letting go of Mr. Moll's leg, stumbled backward, rolled on the ground, and began to stand up while reaching into his pants or pocket. Mr. Moll testified that upon seeing this reaching motion, he ran out of a nearby door into the parking lot. Mr. Moll testified that he went to his truck so that he would have something between himself and the defendant if the defendant produced a firearm. While in his truck, he heard a loud "pop" sound inside the shop, which he recognized as a gunshot, and called 911. Chris Goss exited the shop within seconds of the gunshot sound and exclaimed, "Call 911, he just shot Pork Chop!" to which Mr. Moll replied, "I'm calling!" (T.T. 159). Mr. Moll then left his truck to go to a nearby business in order to acquire the

5

address of the shop as he was not familiar with the area. While returning to the shop, he witnessed Chris Goss and Ryan Smith trying to help the victim into a company pickup truck which Ryan had been using. (T.T. 156-62). Two recorded 911 calls were played in open court, one of which included the caller stating, "[t]he other day, he showed us the gun." (T.T. 56-59, 69).

Officers from the North Strabane Township Police Department (NSTPD) received a 911 dispatch at approximately 4:00 p.m. indicating that a male had been shot and that the "active shooter" was still present at the location. Upon reaching the driveway of an industrial building at 72 Wilson Road, the officers encountered three or four males, including the victim, in a pickup truck. The victim was in the front passenger seat of the truck and the men were told to wait for the ambulance to arrive. (T.T. 20-29).

Officer Christopher Wilson, along with Sergeant Bonnie J. Downing, tactically entered the building with guns drawn and found a man, later identified as the defendant, kneeling on the floor with his back to them. According to both officers, the defendant seemed disoriented and did not listen to commands until they were given three or four times. The defendant, once placed in handcuffs, told the officers that he did not know what happened and that he was just turning in his pay slips. No pay slips were recovered in the shop, but Officer Wilson did see a small silver handgun on the ground about ten to twelve (10-12) feet away from the defendant. (T.T. 23-29, 41).

The victim was taken by ambulance to Canonsburg Hospital due to the immediate need for care, while the defendant was taken by medical helicopter to Allegheny General Hospital (AGH) in Pittsburgh. Officer Wilson accompanied the defendant on this helicopter trip. At the hospital, Officer Wilson requested that the defendant's hands not

6

be washed to preserve any gunshot residue (GSR) and that his clothing be seized. While at the hospital, the defendant told Officer Wilson that the whole incident was over his boss, Matt Rosenboom, not paying him for trips and the defendant wanting to quit. (T.T. 29-34). The victim later died of his wound at the hospital.

Dr. Leon Rozin, a forensic pathologist with over fifty (50) years of experience in the field, testified as a stipulated expert in the field of forensic pathology, and presented his autopsy findings as to the cause and manner of the victim's death. He ruled the cause of death to be a "single gunshot wound of the torso, damage of internal organs and internal bleeding." He ruled the manner of death to be "homicide." (T.T. 104-12).

Detective John Wybranowski, Jr. and Lieutenant Daniel R. Levi led the investigation of the case for the NSTPD and testified at trial as co-affiants. After arriving at the scene and consulting with their chief, they transported Roy Moll, Chris Goss, and Richard Ryan Smith[1] to the NSTPD station to be separately interviewed. At the conclusion of the interviews, the Detective and the Lieutenant prepared a search warrant and traveled to Pittsburgh. They had it reviewed and signed in Allegheny County Night Court as the defendant was in an Allegheny County hospital at that time. The officers then traveled to AGH to serve the warrant on the defendant at approximately midnight. (T.T. 518-21, 609-17).

After being photographed in his hospital bed, the defendant reviewed, signed, and dated both a *Miranda* rights form and a waiver of *Miranda* rights form. (T.T. 522-32). The defendant proceeded to go into detail about what he did on February 10, 2011, and told the Detective and the Lieutenant that he returned to the shop that day and gave his

---

[1] Repeated attempts were made by both the NSTPD and the Washington County District Attorney's Office to find Richard Ryan Smith and contact him to procure his testimony for trial, but these efforts were unsuccessful. (T.T. 614-16).

completed invoices to Matt Rosenboom who was actually still in Texas at the time. (T.T. 533-34, 590). The defendant acknowledged that he owned a .38 caliber revolver, a fact that was later confirmed through the Bureau of Alcohol, Tobacco, and Firearms database. (T.T. 535, 563). The defendant claimed that he did not have an argument or get into a fight with anyone that day, and said that he knew the victim but did not shoot him. (T.T. 536-37). The defendant eventually asked, "Is he alive or what?" concerning the victim and wanted to know if the Detective and the Lieutenant were "joking" with him. (T.T. 539, 541). The defendant stated that he was having trouble remembering, at which time the fifteen (15) minute interview concluded. (T.T. 540, 592, 621).

The next day, upon defendant's discharge from AGH, the Detective and the Lieutenant arrested him and took him to be arraigned before Magisterial District Judge Jay Weller in the same building where the NSTPD station is located. (T.T. 543, 622). After being arraigned, the defendant was taken into the police station and allowed to sit in the Lieutenant's office as paperwork was completed for his commitment to the Washington County Correctional Facility (WCCF). While in the Lieutenant's office, the defendant requested that he be allowed to make a phone call. The Lieutenant acquiesced to this request and dialed the defendant's girlfriend at the defendant's request. While he was speaking to his girlfriend, the Lieutenant heard the defendant say, "He beat me all over my face, I had to pull my gun to protect myself." (T.T. 623). Approximately five minutes later, a female voice identified as Carol Kirtley, the defendant's wife, called the Lieutenant's phone and asked to speak with the defendant. The defendant was then heard saying, "He beat me up and I had to shoot him." (T.T. 626). Detective Wybranowski overheard part of the conversations and heard the defendant say, "He started it, he beat

8

me all over my face, I had to pull my gun to protect myself." (T.T. 545). It was noted that the defendant spoke of an encounter with a single individual and never mentioned a pipe or any other weapon in these calls. (T.T. 545, 623-27).

The defendant, while being transported to the WCCF, asked the Detective and the Lieutenant questions concerning the homicide laws of Pennsylvania in comparison to the homicide laws of Texas. (T.T. 546). The defendant did not receive a reply to any of the questions he posed on the way to the WCCF. While being handed over to the corrections staff at the WCCF, the Detective and the Lieutenant overheard the defendant telling a corrections officer, "[h]e beat me up, I had to shoot the mother fucker" and, "I shot him." (T.T. 547-48, 638).

On February 16, 2011, Lieutenant Levi and Pennsylvania State Police (PSP) Trooper Todd Porter recovered a fired bullet from the rear area of the shop approximately twenty (20) to twenty-five (25) feet from the scene of the shooting. The bullet was first discovered by Chris Goss. (T.T. 635-36, 651-52).

Seven (7) PSP troopers and scientists testified as stipulated experts for the Commonwealth concerning various evidentiary aspects of the case and came to the following conclusions:

1) No fingerprints were recovered from the firearm due to a combination of the dry and cold weather conditions coupled with the wet and dirty conditions of the shop floor. (T.T. 293-307).

2) No blood was found on the firearm, but samples from other items which tested positive for blood were collected and sent out for DNA analysis at another PSP lab. (T.T. 308-40).

3) The blood on the victim's and defendant's clothing matched their respective profiles along with one or more identifiable DNA contributors. There was no evidence of the victim's blood on the defendant's clothing. (T.T. 342-63).

9

4) When the firearm was recovered, the revolver's cylinder was fully loaded with five jacketed, hollow point rounds, one of which was spent. GSR test kits were conducted on Roy Moll, Chris Goss, and Richard Smith the night of the incident. (T.T. 366-421).

5) Various types of evidence were recovered from the victim during the autopsy, including a GSR test kit, blood samples, skin samples, hair samples, clothing, and finger and palm prints. The location of blood stains and bullet holes on the victim's clothing were also noted. (T.T. 423-35).

6) The GSR kit test results for Roy Moll, Richard Smith, and Chris Goss were mixed indicating that they could have come in contact with GSR that day. The results of the GSR kit administered to the defendant approximately eight (8) hours after the incident indicated that he could have fired a gun recently, was near a gun recently when it fired, or received GSR particles on his hands by a recent touch transfer. GSR test kits are ideally taken within five (5) hours of an incident as GSR particles can fall off over time. (T.T. 451-71).

7) Testing was conducted on the .38 caliber revolver, a spent shell casing, four unspent cartridges, a discharged metal-jacketed bullet, and clothing. It was noted that the revolver functioned properly, would not discharge upon being dropped, and had a normal trigger pull weight for a handgun of that type. A "stops depositing test" determined that the firearm would discharge GSR in the range of three to five (3-5) feet upon being fired. This test, coupled with an analysis of GSR on the victim's clothing, indicated that the victim was shot at a distance of not less than three (3) feet but not more than five (5) feet away. The fired bullet jacket recovered in the shop on February 16, 2011 was a match to test bullets fired from the defendant's .38 caliber revolver. (T.T. 473-94).

The defendant, Danny Keith Kirtley, testified on his own behalf after being given a colloquy on the record concerning his rights to remain silent, to not testify, and to call character witnesses. The defendant indicated that he understood his rights, wished to testify in his own defense, and did not want to call any character witnesses. (T.T. 731-38). The defendant's version of the events leading to his arrest and trial are as follows:

On February 9, 2011, Chris Goss called the defendant and told him to finish up his work, help his co-workers finish their work, and to call him back later that day to receive the location of his job for the next day. The defendant went to Ligonier, Pennsylvania on February 10, 2011 and finished the two small jobs assigned to him

10

around lunchtime. He called Chris Goss to give him an update on the jobs and to complain about the other employees not helping him finish his work the prior day. He never called the victim a "fat ass" during the conversation. Chris Goss called the defendant later that day and told him to stop by the shop and turn in his invoices as Chris would not be there on Friday. The defendant, who owned a firearm and had a license to carry, was not mad at anyone and actually "was having a good day." (T.T. 740-48).

The defendant arrived at the shop around 4:00 p.m. and began to fill out his invoices in this truck when Roy Moll and the victim opened the door of the shop and yelled to him that Chris Goss wanted to see him. The defendant left his truck with his .38 caliber revolver still in his right front pants pocket and went into the shop where Chris was welding a set of metal stairs. It was at this time that either Roy Moll or the victim hit the defendant over the head with a piece of metal pipe as he walked by the table where they were located. The defendant did not raise his fists or say anything that would have started an altercation. The defendant thought he was going to die as Roy Moll and the victim continued to hit and kick him in the face and head while he was on the floor. He lost consciousness at some point, but did manage to remember seeing the victim holding a metal pipe. He guessed that Roy Moll and the victim were mad at him for complaining to Chris Goss. (T.T. 749-53).

The defendant was still being struck while on the floor covered in blood with his ear and head split open and his face and head swollen. The defendant believed the two men were trying to kill him as they continually struck him in the face. He managed to stagger to his feet and pull out his firearm at which time he fired one shot at the victim in self-defense. At the exact time he fired the weapon, he was again hit in the head with the

11

pipe and knocked unconscious. He admits to firing the gun in self-defense but could not remember being in the medical helicopter or being taken into the hospital. He did remember being in the hospital when the police came to talk with him and take photographs. (T.T. 754-55).

On cross-examination, the defendant testified that the shooting was not an accident, that he did it on purpose, and that he would do it again under the same circumstances. (T.T. 761). He claimed that Lieutenant Levi was lying about the substance of the phone conversation he had while at the police station. He also claimed that Chris Goss was lying when he testified that he saw Roy Moll run out the door and that he was next to the victim when the defendant fired his revolver. (T.T. 761-82).

Numerous medical professionals also testified on behalf of the defense. Their respective examinations and conclusions are as follows:

1) Dr. Howard R. Goldberg, M.D. testified as a stipulated expert in the field of ear, nose, and throat medicine. He met with the defendant on May 27, 2011 at which time he conducted an evaluation of his left ear. He was told by the defendant that the defendant was struck in the head multiple times with a pipe on February 10, 2011. The examination of the defendant's left ear revealed "an apparent laceration, which was well healed at that point in time, with no evidence of a persistent abnormality or deformity." (T.T. 441).

2) EMT Gerald Carlson and paramedic Peter Chandrik testified as to the care rendered to the defendant at the scene. They first encountered the defendant when they entered the shop and found him face down in handcuffs. Multiple injuries were noted to the defendant's head and face. The defendant was able to tell them his name, but was unable to give them his address or tell them what happened. The defendant did exhibit some signs of head trauma such as continually repeating the phrase "I was dropping my invoice off, I don't know what happened." (T.T. 662-80).

3) Dr. Brent Hardman, M.D., who along with Doctors Nesbitt, Gunion, and Moorman, treated the defendant at AGH. The defendant's medical history at AGH indicated that upon arrival he told the staff that he had been shot in the ear. Dr. Hardman testified that the defendant did have bruising on his face and head and a laceration on his ear, but that he did not have any facial fractures. The defendant was given medications for

12

his asthma while at AGH and was discharged with pain medication and an antibiotic. The defendant was never diagnosed with a concussion. (T.T. 681-99).

4) Dr. Karl E. Williams, M.D. testified for the defense as a consultant in the field of forensic pathology. Dr. Williams is also the chief medical examiner of Allegheny County. He reviewed all of the police, evidentiary, and medical reports in the case to support his findings which were memorialized into two reports dated July 25, 2012 and August 23, 2012. Dr. Williams believed that the defendant's concussive state was significant based on the substance of the police reports and that this state would have impacted any conversations he had the night of February 10, 2011. Dr. Williams also believed that the defendant would have lost consciousness at some point in time. On cross-examination, Dr. Williams stated that he primarily deals with deceased individuals in a coroner's office and that he is not board certified in neurology, neurosurgery, or plastic surgery. (T.T. 701-18).

## Procedural History

Defendant was arraigned before Magisterial District Judge Weller on charges of Criminal Homicide, 18 Pa.C.S.A. § 2501(a), Aggravated Assault, 18 Pa.C.S.A. § 2702(a)(1), (4), and Simple Assault, 18 Pa.C.S.A. § 2701(a)(2), on February 11, 2011. (Docket 7). A preliminary hearing was held on February 16, 2011 before Magisterial District Judge Joshua P. Kanalis at which time all charges were held for Court. (Docket 7). A formal arraignment was conducted before the Trial Judge, the Honorable Judge Janet Moschetta Bell (Ret.), on April 6, 2011. (Docket 10, 19).

Initially, the Washington County Public Defender's Office entered its appearance and filed a discovery motion on behalf of the defendant on April 5, 2011. (Docket 11). Attorney David S. Shrager later entered his appearance on behalf of the defendant on April 27, 2011. (Docket 13). The Washington County Public Defender's Office requested to withdraw its appearance on behalf of the defendant, and the request was granted by Court Order dated May 9, 2011. (Docket 15). Attorney Shrager's *Motion for Discovery and for Extension of Time to File Pre-trial Motions* was granted by Court Order filed May 16, 2011. The Commonwealth was ordered to provide all mandatory discovery to

13

the defense by June 10, 2011, and the defense was ordered to file all pre-trial motions by July 11, 2011. (Docket 16).

Attorney Shrager filed a fourth *Motion for Extension of Time to File Pre-trial Motions* on October 14, 2011, requesting DNA test results and any outstanding discovery. The *Motion* was granted by Court Order on the same day, granting the defense until November 14, 2011 to file any pre-trial motions. (Docket 24). Attorney Shrager filed five (5) separate *Omnibus Pre-trial Motions*, along with a fifth *Motion for Extension of Time to File Pre-trial Motions*, on November 14, 2011. The *Motion for Extension of Time to File Pre-trial Motions* claimed that DNA and other scientific test results were still outstanding. (Docket 25-30). The Commonwealth filed an additional discovery response on December 1, 2011. (Docket 31).

On December 2, 2011, the Trial Judge scheduled all five (5) of the defendant's suppression motions for argument on February 1, 2012. (Docket 32-36). After granting defense counsel's request for a continuance, the hearing on the suppression motions was re-scheduled to April 27, 2012. (Docket 37). A new *Case Management Order* was issued by the Trial Judge on May 8, 2012, designating the timeline for the remaining pre-trial stages of the case and setting jury selection for September 10, 2012. (Docket 43). Also on May 8, 2012, the Trial Judge denied all five (5) of the defendant's pre-trial suppression motions. (Docket 44). On September 10, 2012, the day set for the jury trial to begin, Attorney Shrager presented the Trial Judge with a *Motion for Change of Venue and/or Venire* along with a *Motion for Continuance*. The Petitions were denied by Court Order dated the same day, and jury selection commenced. (Docket 48). After five (5) days of testimony, the jury returned a verdict on September 18, 2012. The defendant was found

14

guilty of one count of Voluntary Manslaughter – Unreasonable Belief and two counts of Aggravated Assault. He was found not guilty of one count of Criminal Homicide – Murder of the 3rd Degree. (Docket 49). One count of Simple Assault was *nolle prossed* by the Commonwealth. (Docket 53).

The Trial Judge ordered that the Washington County Adult Probation Office (WCAPO) prepare a pre-sentence investigation report, and the WCAPO did so in a timely fashion. (Docket 51, 53). Subsequently, the defendant was sentenced to seven to twenty (7-20) years in an appropriate state correctional institution on the count of Voluntary Manslaughter – Unreasonable Belief as the Court treated the two counts of Aggravated Assault as having merged with the Voluntary Manslaughter. (Docket 53). Attorney Shrager filed a *Notice of Appeal to Pennsylvania Superior Court* on December 18, 2012. (1976 WDA 2012) (Docket 57).

On December 31, 2012, the Trial Judge issued an Order requiring the defendant to file a Concise Statement of Matters Complained of on Appeal, pursuant to Pa.R.A.P. 1925(b), within twenty-one (21) days of the date of the Order. (Docket 60). The Trial Judge, the Honorable Janet Moschetta Bell, retired effective January 4, 2013. An oral *Motion for Extension of Time to File Concise Statement of Matters Complained of on Appeal* was presented by Attorney Shrager and granted by President Judge Debbie O'Dell Seneca on January 17, 2013, giving the defendant until February 21, 2013 to file his Concise Statement. (Docket 62). On February 1, 2013, the instant case was transferred to the undersigned. (Docket 63). Defendant timely filed his *Concise Statement* on February 21, 2013, setting forth twelve (12) claims of error. (Docket 65).

15

<u>Legal Analysis</u>

As stated *supra*, this Court will treat the defendant's twelve (12) claims of error as falling into four (4) categories. First, that the Trial Judge erred/abused her discretion by denying his suppression motions. (Docket 65: Paragraphs 3-7). Second, that the Trial Judge erred/abused her discretion by admitting certain Commonwealth evidence and testimony over counsel's objections. (Docket 65: Paragraphs 8-11). Third, that the Trial Judge erred in not granting counsel's motion for a mistrial based on counsel's claim that the prosecutor made an improper and highly prejudicial comment as to the defendant's right to remain silent. (Docket 65: Paragraph 12). And, lastly, that the sentence imposed on the defendant was unduly harsh and improper under the circumstances. (Docket 65: Paragraphs 15-16).

1.) <u>Denial of Suppression Motions</u>

Defendant claims that his five (5) suppression motions filed on November 14, 2011 were improperly denied by the Trial Judge. (Docket 25-29, 65). The Trial Judge conducted a hearing on the suppression motions on April 27, 2012, and, subsequently, denied them all on May 8, 2012. (Docket 44). It should be noted that the Commonwealth presented the testimony of four witnesses along with applicable case law at the suppression hearing, while the defense did not call any witnesses and did not provide any applicable case law although defense counsel expressed his intention to do so. (Docket 44) (H.T. 146-47). The trial court's denial of a suppression motion will be upheld on appeal if the court's factual findings are supported by the record and the legal conclusions drawn from those facts are correct. *Commonwealth v. McAdoo*, 46 A.3d 781, 783 (Pa. Super. 2012). Additionally, "[i]t is within the suppression court's sole province as fact-

16

finder to pass on the credibility of witnesses and the weight to be given their testimony." *Commonwealth v. Walton*, 2013 WL 71827 (Pa. Super. 2013).

Defendant first claims that his motion to suppress his statements made to Detective Wybranowski of the NSTPD during an interview at AGH during the late evening hours of February 10, 2011, the day of the incident, was improperly denied. (Docket 27, 65: Paragraph 3). The suppression motion alleges that the defendant's Fifth Amendment rights under the U.S. Constitution were violated because he was injured and under duress at the time of the interview, notwithstanding the fact that he was advised of his *Miranda* rights. (Docket 27).

The defendant executed both a *Miranda* rights acknowledgement form and a waiver of *Miranda* rights form before talking with Detective Wybranowski. (H.T. 62-63). The Detective noted that the defendant had facial injuries at the time, but also noted that he was very talkative and did not seem to be confused. (H.T. 63). The defendant's rights were given to him orally while he followed along on a copy of the document from which the Detective read. The defendant did not have questions about the content of the forms, and the interview began shortly thereafter. (H.T. 65). At one point during the interview, the defendant stated that he could not remember something about his invoices. The Detective asked the defendant if he was suffering from blackouts, to which the defendant responded that he did when he used to drink, but that he was not currently suffering from blackouts. (H.T. 91). The interview concluded about twenty (20) minutes later when the defendant stated, "I think I need an attorney." (H.T. 71). Detective Wybranowski testified that the defendant did not appear to be fatigued, tired, or confused at any time during the interview. (H.T. 98-99).

17

The defendant's argument for suppression centers on the fact that he was interviewed eight (8) hours after suffering head injuries, thus rendering his statements involuntary. (H.T. 121-122). The prosecution may not use statements, whether exculpatory or inculpatory, stemming from the custodial interrogation of the defendant unless it demonstrates the use of procedural safeguards effective to secure the privilege against self-incrimination. *Miranda v. Arizona*, 384 U.S. 436, 444 (1966). The amount of time that passes between when a defendant is taken into custody and when the interview is conducted is not determinative of the voluntariness of the statement; rather, the situation must be viewed under the totality of the circumstances. *Commonwealth v. Housman*, 986 A.2d 822, 841 (Pa. 2009). Here, the defendant was not interviewed until eight (8) hours after the incident because he was receiving medical treatment. Detective Wybranowski and Lieutenant Levi received permission from the medical staff at AGH to speak with the defendant who subsequently read and executed both an acknowledgement and waiver of his *Miranda* rights. (H.T. 63-65). At no time did the defendant seem to be confused, unaware, or under duress. Therefore, the suppression motion was properly denied.

Defendant's second suppression motion is based on statements police overheard him make to his girlfriend and wife over the phone while in custody at the NSTPD station on February 11, 2011. (Docket 29, 65: Paragraph 4). Detective Wybranowski and Lieutenant Levi overheard these two conversations as the phone calls took place in their office. (H.T. 109-111) (T.T. 545, 623). Not only were these two conversations not responsive to any sort of custodial interrogation, but they were made at the officers'

18

desks while they were quietly completing paperwork and supervising the defendant pending his transfer to the WCCF. (T.T. 544-45, 623-27).

Attorney Shrager, during the suppression hearing, conceded that these statements were not subject to suppression when he stated:

> Finally, we have statements that were given the next day, which is a statement made on the phone to who Lieutenant Levi described as Mr. Kirtley's girlfriend, statement given to Carol Kirtley, a statement given to a jail guard. I have to, in all candor, say these are statements that were made, they were not statements that were made as a result of questions by any of the police in this case, the statements the next day.

(H.T. 122). The Trial Judge also noted this admission in her Order denying all five (5) of Attorney Shrager's suppression motions. (Docket 44). Therefore, this issue lacks merit and the suppression motion was properly denied.

Defendant's third suppression motion calls for the exclusion of statements made by the defendant to Detective Wybranowski during his transport to the WCCF. (Docket 26, 65: Paragraph 5). Attorney Shrager alleges in his motion that "[w]hile in transport and custody, the detective engaged Danny Kirtley in conversation." (Docket 26). Based on the testimony provided at the suppression hearing, this statement is a complete mischaracterization of the facts. Attorney Shrager even stated during the suppression hearing that:

> I think any statement in the police vehicle that morning when Mr. Kirtley was being transported, where he was given his papers and was asking about the charges, again, the Court heard the testimony about whether these were spontaneous statements or whether these were questions that were being asked by the police of Mr. Kirtley, but I would ask the Court to also grant a suppression motion as to those statements, not withstanding (sic) the fact that I believe Mr. Lucas can argue that these were spontaneous, non-responsive statements that were made in the police vehicle.

(H.T. 122-23).

19

After being fingerprinted at the NSTPD station, the defendant was placed into a police vehicle for transport to the WCCF on the morning of February 11, 2011. (T.T. 546). While en route to the WCCF, defendant continually questioned Detective Wybranowski and Lieutenant Levi as to what his charges were and how the homicide laws of Pennsylvania compared to those of Texas, his home state. These questions were met with silence by the officers. (T.T. 546-47). Although the defendant was clearly in custody at the time of the statements, no questions were posed by the police that would prompt a response of any kind from the defendant. The defendant "volunteered these statements of his own free will; thus, the remarks constitute merely gratuitous utterances unsolicited by the government and are admissible." *Commonwealth v. Fisher*, 769 A.2d 1116, 1125 (Pa. 2001).

Similarly, while being handed over to the staff at the WCCF, the defendant was overheard telling a corrections officer, "He beat me up, I had to shoot the mother fucker" and, "I shot him." (H.T. 80, 112-113) (T.T. 547-48, 638). These statements were made in response to the corrections officer asking the defendant, "what happened to you?" presumably in reference to his facial injuries and the bandage on his head. (H.T. 77, 112). These statements were also properly admitted as spontaneous, unprompted, voluntary statements made by an opposing party under Pa.R.E. 803(25). *Fisher, supra.* Accordingly, the suppression motion was denied.

Defendant's fourth suppression motion claims that he made statements on February 14, 2011 that were memorialized in a memorandum and should have been suppressed by the Trial Judge. (Docket 28, 65: Paragraph 6). It is not clear as to the memorandum to which defense counsel is referencing, but the Court believes that

20

Attorney Shrager was referencing one or both of the memorandum reports prepared by Detective Wybranowski and Lieutenant Levi. These reports, based on testimony presented at the suppression hearing, detailed the events and conversations of the days immediately following the February 10, 2011 death of Trevor Compton. (H.T. 78, 111). In the Commonwealth's first *Discovery Response*, three items prepared during the applicable time frame are delineated as an "Investigation Report" prepared by either Detective Wybranowski or Lieutenant Levi. (Docket 18: Section I(viii), (xxii), (xxvii)). To the extent that these reports deal with statements made by the defendant at the scene of the shooting, at AGH, at the NSTPD station, during transport from the NSTPD station to the WCCF, and while at the WCCF, the denial of suppression of these statements has been reviewed above, and this Court relies upon its analysis of *Concise Statement* Paragraphs 3-7.

Defendant's final claim of error concerning the denial of a suppression motion deals with statements made by the defendant at the scene of the shooting on February 10, 2011. (Docket 25, 65: Paragraph 7). Defense counsel claims that Sergeant Downing and Officer Wilson, the first officers to respond to the scene, immediately began to interrogate the defendant upon encountering him inside of the welding shop and placing him in handcuffs. (Docket 25) (H.T. 119-120). At the suppression hearing, defense counsel argued that the statements, specifically those concerning the defendant having a gun, were the product of a custodial interrogation. The Commonwealth argued that the statements were non-testimonial and fell under the public safety exception. The Trial Judge, in her *Order* denying defendant's suppression motions, indicated that she agreed

21

with the Commonwealth that the public safety exception applied to the circumstances in which these statements were made. (Docket 44).

The public safety exception is an exception to the rule in *Miranda* and allows officers to briefly question a suspect in custody in order to determine the location of a firearm used in a shooting and to ascertain who is/are the shooter(s) and who is/are the victim(s). *Commonwealth v. Bowers*, 583 A.2d 1165, 1171 (Pa. Super. 1990); citing *New York v. Quarles*, 467 U.S. 649 (1984). In the instant case, the actions of Sergeant Downing and Officer Wilson were in accordance with the public safety exception to the rule in *Miranda*. Testimony provided at both the suppression hearing and the trial indicated that the officers were responding to a scene with an "active shooter" and initially had difficulty ascertaining who was the shooter and who was the victim, given that both Trevor Compton and the defendant were injured, although the victim's injuries were much more severe at the time. (H.T. 7-15, 39-45) (T.T. 20-29, 78-84). Defendant's suppression motion was properly denied based on the testimony provided at the suppression hearing and at trial, in accordance with the applicable case law.

2.) Evidentiary Rulings

Defendant claims that the Trial Judge erred when she made evidentiary rulings adverse to the defense concerning the introduction of 911 tapes, testimony regarding the defendant having a gun the night before the incident, and testimony regarding a conversation between Matt Rosenboom and Chris Goss. (Docket 65: Paragraphs 8-11). "Preliminary questions concerning the qualification of a person to be a witness, the existence of a privilege, or the admissibility of evidence shall be determined by the court." Pa.R.E. 104(a). The standard of review on a challenge to a trial court's

22

evidentiary ruling is one of deference, and the scope of that review is limited to a determination of whether the trial court abused its discretion. *Commonwealth v. Hernandez*, 39 A.3d 406 (Pa. Super. 2012).

Defendant first claims that counsel's hearsay objection to the introduction of two (2) 911 tapes of phone calls pertaining to the shooting was improperly overruled by the Trial Judge. The tapes were recordings of phone calls to 911 initiated by Roy Moll and Chris Goss. (Docket 65: Paragraph 8) (T.T. 4). The Commonwealth responded to defense counsel's hearsay objection by arguing that the recordings were admissible under the res gestae exception as excited utterances and present sense impressions. (T.T. 5).

Generally, hearsay is defined as an out-of-court statement offered to prove the truth of the matter asserted. Concerning the res gestae exception to the hearsay rule, the Supreme Court of Pennsylvania has stated:

> A res gestae declaration may be defined as a spontaneous declaration by a person whose mind has been suddenly made subject to an overpowering emotion caused by some unexpected and shocking occurrence, which that person has just participated in or closely witnessed, and made in reference to some phase of that occurrence which he perceived, and this declaration must be made so near the occurrence both in time and place as to exclude the likelihood of its having emanated in whole or in part from his reflective faculties.

*Commonwealth v. Coleman*, 326 A.2d 387 (Pa. 1974). "Within the scope of res gestae there exists four distinct exceptions to the hearsay rule, all possessing different indicia of reliability; declarations of present bodily condition, declarations of present mental state and emotion, excited utterances, and declarations of present sense impression." *Id.* at 389. These exceptions are incorporated into the Pennsylvania Rules of Evidence, Pa.R.E. 803(3), 803(2), and 803(1).

23

In the instant case, the two calls were played aloud in court and the parties who made the calls, Roy Moll and Chris Goss, were subject to cross-examination subsequent to the playing of the calls. (T.T. 133, *et seq.*, 217, *et seq.*). The substance of the conversations clearly indicated that both callers were extremely excited and upset at the time they were describing what had just happened and what was currently happening in front of their own eyes. (T.T. 58-73). Lindsay Keene, systems manager and records custodian for the Washington County 911 Center, testified that the tapes were fair and accurate recordings of the calls received on February 10, 2011. (T.T. 57-60). The custodial integrity of the tapes coupled with the high indicia of reliability which accompanies excited utterances and present sense impressions in an emergency situation demonstrates that the Trial Judge's ruling was proper. Counsel's hearsay objection was correctly overruled as the statements fell within the res gestae exception to the hearsay rule. *See* Pa.R.E. 803(2).

Second, defendant claims that the Trial Judge erred when she overruled two separate objections to testimony concerning the defendant possessing a firearm the night before the incident. (Docket 65: Paragraphs 9-10). The first objection, which was made during the playing of the 911 tapes, was made on grounds of prejudice. (T.T. 66-68). The second objection was made during the direct testimony of Roy Moll and was made on relevancy grounds. (T.T. 139-42). The Trial Judge's ruling on the admission of the 911 tapes has already been addressed herein, but Attorney Shrager made a separate objection to a certain portion of the second call which requires further analysis. The objection was that the statements made by the caller were highly prejudicial based on the fact that the caller stated, "He came in with a gun," and "The other day, he showed us the gun." (T.T.

24

66, 69). The second objection, made during the direct examination of Roy Moll, was made on relevancy grounds as counsel argued that possession of a firearm by the defendant on the night of February 9, 2011 was not relevant to the events which unfolded on February 10, 2011. (T.T. 141).

The Commonwealth argued that both statements were admissible based on the concept of demonstrating possession of the instrument that caused the fatal harm and to show state of mind. (T.T. 66-67, 141). The Commonwealth offered in support of its argument the case of *Commonwealth v. Akers*, which held that: "The possession by the defendant of a weapon or implement of crime is relevant even though there is no evidence that it was used in the commission of any particular crime, but there must be evidence that some crime was committed." 572 A.2d 746, 754 (Pa. Super. 1990).

The Supreme Court of Pennsylvania has also noted that the possession of a weapon close in time to the commission of a crime:

> [I]s relevant to show that the defendant owned or had access to an implement with which the crime could have been committed. The possession by the defendant of a weapon or implement of crime is relevant even though there is no evidence that it was used in the commission of any particular crime, but there must be evidence that some crime was committed. The possession or ownership of the weapon or implement of crime must be reasonably proximate to the commission of the crime. If too great a period has elapsed between the commission of the crime and the period of possession or ownership, the evidence would be too remote and hence inadmissible…

*Commonwealth v. Yount*, 314 A.2d 242, F.N. 8 (Pa. 1974) (citations omitted). Here, not only was the defendant said to have possessed the firearm that killed Trevor Compton the night before the shooting occurred, but he was also said to have showed it to Roy Moll. Mr. Moll saw the handgun in person the night before the incident when he and the defendant were investigating a loud noise outside of the welding shop and the defendant

25

went to his truck and returned with a handgun stating, "That's why I carry this." (T.T. 142-44). The objections were properly overruled as applicable case law establishes that the testimony was highly relevant and did not unduly prejudice the defendant.

The defendant's final claim of error concerning the Trial Judge's evidentiary rulings is that testimony of conversations between business owner Matt Rosenboom and supervisor Chris Goss were improperly admitted. (Docket 65: Paragraph 11). Defendant claims that this testimony constituted highly prejudicial and irrelevant hearsay. The conversations between Mr. Rosenboom and Mr. Goss included a discussion on February 9, 2010 concerning the defendant's work assignment for the next day after he called and complained to Mr. Rosenboom about the other employees' work ethic. The second conversation included discussion of firing the defendant on February 10, 2011, after receiving a complaint from a customer. (T.T. 204-11). The Commonwealth argued that these conversations were not hearsay as they began with an admission by an opposing party and were followed by a natural development of the facts, including Mr. Rosenboom's reasons for asking Mr. Goss to fire the defendant. (T.T. 204-05).

The defendant's statements to Mr. Rosenboom concerning his views on the other employees' work ethic and conduct are clearly admissible as admissions by an opposing party. Pa.R.E. 803(25). These statements led to Mr. Rosenboom changing the defendant's work assignment for the next day and contacting Mr. Goss to make sure the move was executed. The defendant went to the assigned work site in Ligonier, Pennsylvania the next day, and Mr. Rosenboom received a call from that specific customer complaining about the defendant's conduct. This call led him to decide to fire the defendant and he relayed his decision to Chris Goss. The conversations between Matt Rosenboom and

26

Chris Goss were properly admitted as they were not being used to prove the truth of the matter asserted, but rather were being used to show course of conduct and motive for the events of February 9-10, 2011. "An out-of-court statement offered to explain a course of conduct is not hearsay." *Commonwealth v. Dent*, 837 A.2d 571, 577 (Pa. Super. 2003).

3.) <u>Motion for a Mistrial</u>

Defense counsel claims that the Commonwealth improperly commented on the defendant's right to remain silent during cross-examination when the prosecutor asked him, "You never told anybody in law enforcement, until today, what you just told us?" (T.T. 775). The Supreme Court of Pennsylvania has enunciated the standard of review for the denial of a request for a mistrial as:

> [T]he remedy of a mistrial is an extreme one.... It is primarily within the trial court's discretion to determine whether Appellant was prejudiced by the event that forms the substance of the motion. Finally, it must be remembered that a mistrial is required only when an incident is of such a nature that its unavoidable effect is to deprive the appellant of a fair and impartial trial.

*Commonwealth v. Montgomery*, 626 A.2d 109, 112-13 (Pa. 1993) (citations omitted).

Defense counsel relied upon the *Griffin v. California*, 380 U.S. 609 (1965), line of case law to support his oral motion for a mistrial. In *Griffin*, the United States Supreme Court overturned as unconstitutional under the federal constitution a provision of the California state constitution that explicitly granted the power to prosecutors to request that the jury draw an inference of guilt from the defendant's **refusal to testify** in his own defense. *Id*. Here, the *Griffin* line of case law is inapplicable to the facts of the case at hand as the defendant chose to testify in his own defense and did so after completing a colloquy on the record. (T.T. 731-34). The prosecutor's comments during cross-examination of the defendant did not question his right to remain silent, but rather

27

questioned why he had told numerous law enforcement officers one story in the past and was now telling a different story at trial. (T.T. 776-82). This is an issue of consistency and credibility for the jury, not the right to remain silent under the Fifth Amendment to the United States Constitution. Accordingly, the motion was properly denied as defendant did not meet the high burden necessary for the extreme remedy that is the grant of a mistrial. *Montgomery*, *supra*.

4.) <u>Defendant's Sentence</u>

The defendant's final issue on appeal is whether the sentence handed down by the Trial Judge was fair and proper under the circumstances. Defendant claims that his sentence is "unduly harsh" and that the Trial Judge failed "to give careful consideration to all relevant factors during sentencing such as the facts of the trial, Appellant's past criminal record, family history and work history." (Docket 65: Paragraphs 15-16). The applicable standard of review when evaluating the sentence handed down by the trial court is as follows:

> Sentencing is a matter vested in the sound discretion of the sentencing judge, and a sentence will not be disturbed on appeal absent a manifest abuse of discretion. In this context, an abuse of discretion is not shown merely by an error in judgment. Rather, the appellant must establish, by reference to the record, that the sentencing court ignored or misapplied the law, exercised its judgment for reasons of partiality, prejudice, bias or ill will, or arrived at a manifestly unreasonable decision.

*Commonwealth v. Shugars*, 895 A.2d 1270, 1275 (Pa. Super. 2006); citing

*Commonwealth v. Fullin*, 892 A.2d 843, 847 (Pa. Super. 2006).

The trial court must consider explicit factors when sentencing a defendant, specifically the protection of the public, the gravity of the offense in relation to the impact on the victim and the community, and the rehabilitative needs of the defendant. 42

28

Pa.C.S.A. § 9721(b). A trial court must consider the sentencing guidelines when crafting its sentence, but has wide discretion in deciding that sentence. *Shugars, supra.* In the instant case, the defendant was sentenced to an aggregate of seven to twenty (7-20) years in an appropriate state correctional institution for the crime of Voluntary Manslaughter – Unreasonable Belief, 18 Pa.C.S.A. § 2503(b). (Docket 4, 53). A review of the sentencing transcript reveals that all relevant factors, including the defendant's work, criminal, and family history, were considered in arriving upon the defendant's sentence. In fact, a great deal of time and effort was spent on the part of the Trial Judge and the attorneys in determining the defendant's correct prior record score. Defendant's prior record score was originally determined as a two (2), but after lengthy discussions and evaluations of applicable statutory and case law, all parties agreed prior to sentencing to treat the defendant's prior record score as being a zero (0). (Sentencing Transcript [S.T.] 4-6).

The defendant was sentenced in the aggravated range of the Pennsylvania Sentencing Guidelines while using the "deadly weapon used" enhancement matrix as the .38 caliber revolver used obviously qualifies as a deadly weapon. (S.T. 6, 26). In crafting its sentence, the Court reviewed the pre-sentence investigation and highlighted many factors supporting the defendant's sentence, most notably that the defendant never expressed genuine remorse or sorrow for the death of Trevor Compton; that he continued to justify his actions even in the face of the jury's guilty verdict; and, that he has continually minimized the everlasting harm and anguish he has caused to the victim's wife and young children back home in Texas. (S.T. 23-26). The Court also indicated that it found a low likelihood of the defendant being rehabilitated due to his continued efforts to justify his actions, minimize the crime, and blame others. (S.T. 24). The sentence

29

handed down by the Trial Judge was reasonable and proper under the circumstances as the record reveals that all relevant factors were considered.

## Conclusion

Based on the foregoing analysis and the facts presented at trial, this Court finds that all of the defendant's matters complained of on appeal lack merit. Accordingly, the jury's verdict should be upheld and the Trial Judge's corresponding *Order of Sentence* should be affirmed.

BY THE COURT:

_____, J.
John F. DiSalle, Judge

30